Good morning. May it please the Court, my name is Henry Carbajal of Fenwick & West on behalf of Plaintiff Appellant Darnell McGarry and Plaintiff Appellant Ricardo Capello. Okay, now before you go forward, I note on the day sheet the maximum argument is listed as 20 minutes aside. We've set it up for 10. Frankly, I'm not sure you need 20 minutes, but since it's on the day sheet, we'll start it off at 20 minutes, but don't feel obliged to use it all, but I just wanted to make sure that the time in front of you coincided with the day sheet. Thank you, Your Honor. There are three issues I'd like to discuss with the Court today. First relates to Plaintiff Appellant's contentions that the Court erroneously denied motions for counsel made in the trial court below. Secondly, and alternatively, if the Court is inclined not to reverse the District Court's denial of motion for counsel, we would ask that the order granting summary judgment as to certain claims unique to Mr. McGarry and also to Mr. Capello be reversed and those claims be remanded for trial. First as to the District Court's denial of motions for counsel, we submit the District Court abused its discretion in denying multiple requests for counsel. As the Court's aware in its Wilburn case, the evaluation of exceptional circumstances requires at least evaluation of the ability of a litigant to articulate their claims in light of the claims' complexity and also likelihood of success in the merits. Counsel, Mr. Capello is a very determined pro se litigator. By his own testimony on deposition, he spends six to eight hours a day on this case. He's read 20,000 documents produced in discovery. He has been quite articulate in his briefing both in the District Court and the Court of Appeals. How on this record can I say that the District Court abused its discretion? He's done a better job of articulating his position than many lawyers. Oh, Your Honor, we would submit this case as much like the Court's decision in Ashman versus the Corrections Corporation of America where that litigant was also seen as articulate and educated, able to read statutes, but he couldn't properly frame his claim, and that was the determining factor in Ashman. That is the determining factor here in this instance where Mr. Capello was undoubtedly able to cite statutes and case law, but he couldn't frame his claims. An example of that is where his claim regarding retaliation, alleged retaliation by the defendants with respect to his accessing the courts. In the court below and also on appeal, defendants have framed this claim as a dispute over a bedroom assignment and also framed the claim in terms of the standard for prisoners with citing the case Stanton versus Connor. But what's missing from his allegation? Let's take that one in particular. I'm looking at his deposition transcript, SCR 91 at page 26, line 9, and he's asked on deposition, isn't it true, sir, you have told SCC clinical staff you are never going to participate in treatment and you are going to litigate your way out of the program? Answer, true. That essentially confirms what the state has been saying all along that Mr. Capello basically is using litigation, and I looked at a list of the cases that were appended of his filings in the district court. He is a frequent filer of the first order, and it's very hard to say in light of his admissions and the state's position that there's a tribal issue of fact on this question. Your Honor, the first observation is that throughout the duration of the proceedings below, Mr. Capello was a pre-commitment detainee. That is, the state had not proven beyond a reasonable doubt that he was appropriately confined there at SCC. So we disagree that any sort of inference that Mr. Capello is using litigation vexatiously, given that posture, given the fact that it's an admission. It's binding on him as the named party in the litigation. And then you couple that with Judge Dwyer's order telling the director of the SCC, you have to segregate those detainees who refuse treatment because they are interfering in the treatment of those detainees who want sex offender treatment. Your Honor. Essentially, the center acted pursuant to a federal judge's court order in doing that. How under any stretch of the imagination could I conclude that as a matter of law, he's got a cognizable claim for retaliation in the face of this uncontested evidence? Your Honor, we are aware of Judge Dwyer's decision regarding separation of individuals who refuse treatment from individuals who are participating in treatment. That, however, is not what Mr. Capello is alleging is actionable. What he is alleging is that they not only separated him from other wings by putting him in Alder West, but they put him in a place giving him less privileges requiring him to be escorted throughout the SCC. And as he testifies in his declaration with operational equipment that was not functioning, it was not. How does that constitute atypical conditions of confinement? I don't know that it does, Your Honor, but we would submit that that's not the correct standard. The standard instead, because he was a pre-commitment detainee, is that delineated in Jones v. Blanus rather than the atypical and significant hardship standard of Sandin v. Connor. I mean, as I read the record, he's kept in a dormitory-like setting with his own room, and the only difference between the way he's treated and other residents are treated is that he has separate recreation hours and he is escorted when he is in with the rest of the people who are receiving treatment after the court ordered that people like Mr. Capello be segregated. I mean, even the most generous view of those facts, I just don't see how he's much different from any of the other people residing in the FCC. Your Honor, we submit that affording him less recreation time, allowing him to have less money in his account, as opposed to other residents having to be escorted by staff. And again, this is not a person who was committed using the channels of state court. He's being held there upon probable cause. And so the posture may perhaps be different if he was committed. It may be different if there was evidence that he was not just one who refused treatment, but one who had actually interfered with others' treatment and had behavioral problems. There's nothing in the record reflecting that. In fact, the defendants have conceded he had no behavioral management reports. There was no record that he was disruptive in any way. Let me ask you this. I think there are two different questions involved in his challenge to his placement in Alder West. One of them is a sanded due process. That is to say, is it punishment, and therefore, should he have had some sort of a due process hearing before the, quote, punishment was applied? Well, the sanded standard requires such material changes in the conditions of confinement that I don't think you're even close to finding that this is punishment and sanded is triggered. But there's another question, and that is he is contending that he'd been placed there in order to discourage his litigation. And in retaliation for his litigation posture and his litigation activities, and as a mode, therefore, in any retaliation case of discouraging the litigation, can you help me understand what the legal standard is with respect to a retaliation claim for litigation and what evidence you have that, in fact, this is happening because he is a litigator, which he clearly is? Well, Your Honor, we would submit that it is the correct standard. We cited a case in the brief, Mitchell v. Dupnick, regarding disciplinary segregation imposed on those who were pretrial detainees. That would be the prism with which to view this. And in that context, given that the only one of the few differentiating factors between him and the other residents was the fact that he was availing himself of his right to access the courts, the degrees of deprivation vis-à-vis other residents we think is actionable. What does the deprivation consist of? They all have individual rooms. They have keys to their rooms. They're able to use the day room where all of them can congregate together. He's complaining that he has to be escorted if he leaves the building that he's in, but I don't see any evidence in the record that he's been deprived of the use of the law library or anything of that nature. He appears to have access to a typewriter and a lot of paper and ribbon. Where's the disciplinary segregation? This is not the special management unit where the guy's locked down 23 hours a day and we feed him through a hole in the steel door, and we let him out an hour a day by himself in the exercise yard. There's no evidence of that here. Right, but it is, we submit, qualitatively different from how other residents who perhaps do not access the courts as Mr. Capello does. And if the state is placing him in a place where there are less privileges, where there is, you know, where he has to be escorted through the area where it's separated, you know, by five steel doors from the rest of the wings, and the purpose of that according to the assistant clinical director is because he's a, quote, unquote, litigator, we submit that that is actionable as a retaliation claim. And it's different then from the conditions of confinement, sand, and punishment claim. Correct. Help me understand what evidence you have that the reason the state is putting him here is because he's a litigator. I understand he is a litigator and he is placed there. But those two facts don't necessarily mean causation. Right. Your Honor, we have the declaration of Jeffrey Robinson, and we're recounting an admission made by ACC clinical director Kathy Harris. Elder West is where they put the litigators. There is, the defendants describe Elder West as a place where they put individuals who have behavioral problems or who interfere with others' treatment. And is there evidence that you're going to have to deal with that he is interfering with the treatment of others? No, Your Honor. No evidence. Isn't the issue for us, following up Judge Fletcher's question, whether there is evidence from which there could be an inference, like a reasonable inference that he's placed in this location because he's a litigator? In other words, that there's an issue of fact on that, so there shouldn't be a summary judgment. That's correct, Your Honor. As opposed to your client wins for sure or something. I think that's correct, Your Honor. I think it's a reasonable way to view it. If it comes down to a question of degrees of deprivation, how many less hours of rec time, or what were the circumstances of the escorting through the area, then it is an issue of fact really for the jury to decide, and summary judgment was erroneously grounded. Moreover, I think this claim, as all of Mr. Patel's claims, tie into the motion for counsel, in that there is a reasonable likelihood of success with this claim if he had opportunity to frame it and the ability to modify it. Let me go back to the counsel issue for a moment. Do you take issue with the district court's statement of the legal standard? Because as Judge Tallman indicated, that we would review for abuse of discretion, and I think that's correct. If there's a legal error, that's per se an abuse of discretion. But if the district court had the exceptional circumstances standard correctly, then it's a different kind of abuse of discretion review. So did the district court have the standard right, and if not are you asking us to make a new or modify the standard? Well, Your Honor, the recitation of the elements was correct from the district court, exceptional circumstances and then ability to articulate coupled with likelihood of success. The problem was that in those orders, despite Mr. Capello and Mr. McGarry's submissions in their motions for counsel, there was no reasoning listed at all, and that's contrary to the court's precedent, Solis v. County of Los Angeles. In order to have a meaningful appellate review, those reasons for denial must be articulated, and they're not present in those orders. The second point is that we would submit on the basis of what was given to the district court in the motions for counsel for Mr. Capello and Mr. McGarry that exceptional circumstances were in fact present, such that even if the requisite reasoning was placed in the orders, the decision would be an abuse of discretion. I would now like to move on to Mr. McGarry's claims. And in the interest of time constraints, I'll just pick one of his claims for which we submit summary judgment was erroneously granted, and that refers to the claim that SEC is conditioning his treatment progression on improving a diagnosis for which he's not committed. And that's the claim related to the condition of paraphilia, not otherwise specified. We believe there's at least an issue of material fact regarding the paraphilia claim. It is undisputed. I'm sorry, I disclosed my ignorance on this, but I looked up paraphilia in my dictionary. At home it didn't have the word, so it may be a relatively new term. What exactly is it? I think it is. It's in the DSM, and what it is is a mental health condition of a sexual deviancy. It's sort of a catch-all. Certain residents are committed for pedophilia in the SEC or voyeurism or exhibitionism, and paraphilia is kind of a, if they don't fit into those categories, especially the paraphilia NOS, not otherwise specified, is a catch-all where they can't find any other category to place them in. That's where they put it. The defendant's admissions show that SEC is currently imposing the diagnosis on Mr. McGarry, a diagnosis for which he's not committed. We think we assert that that's a violation of this court's directive, this court's Holden and Sharp v. West and Vidic v. Jones, that it was clearly established law at the time of this commitment in February 2004. Moreover, the record reflects a failure diagnosis originated with the defendant, Vince Gallagly, whom the defendant also admitted ministers the SEC treatment program. So we would assert that there's at least a fact issue regarding personal participation. Counsel, is it your position that if a violent sexual predator is committed to the Special Commitment Center for treatment, that in being evaluated by the mental health professionals at the center, if they diagnose an aspect of his mental illness that is different from the original basis for his commitment, that they are somehow precluded from treating him for that? Not that they're precluded from treating him for it, but that they're precluded on conditioning his progression through the program on improving the diagnosis. In Sharp v. West and let me go back to Sealing v. Young, the only reason the civil commitment schemes are the prerequisite for the civil commitment schemes being constitutional is they must offer a pathway to improve the conditions for which individuals are confined and provide a way to eventually be released. If they commit him on two conditions, and there's a stipulation specifying only two conditions, then that is the pathway for him to improve his condition and eventually be released. That's violated if they can, after the fact, tack on additional conditions and require him to also improve on those without first having to comply with a Washington statute and prove it in a court of law beyond a reasonable doubt. So we would submit there are at least fact issues and summary judgments. I was looking for the diagnosis, and I can't find it in all the exhibits I have here, but can you tell me what the difference is between paraphilia and antisocial personality disorder with sexual sadism? Sexual sadism is, of course, not Mr. McGarry's diagnosis. It's Mr. Capello's, I believe. I know that antisocial personality is not a sexual deviancy mental health condition as opposed to paraphilia or sexual sadism. I understand those are both. What were the axis one diagnoses for Mr. McGarry? There was only paraphilia, I believe. There were two. Well, when he stipulated to commitment, nobody had ever done an evaluation of him from a psychiatric standpoint? I think they have, and I think those are reflected in the record. And what was his diagnosis at that time? In the commitment order or just what SEC did? I'm trying to understand. I'm confused on record here. What's the difference between what he was diagnosed for at the time he stipulated a commitment and what the treating physicians at the SEC diagnosed him as after he was tendered to DSHS for treatment? Well, as reflected in document number 64, exhibit 3, it's a declaration from Mr. McGarry. He attached a treatment protocol from 2002, just before the case was filed, where they diagnosed him with paraphilia, paranoid schizophrenia, and antisocial personality disorder. His stipulated commitment order specifies only paranoid schizophrenia and antisocial personality disorder, leaving off paraphilia. Paraphilia is not in that order. Okay. And is it your position that once he is committed to the care and treatment of DSHS, that the doctors are precluded from diagnosing another problem that the offender might have and then treating him for that before they're able to certify that it's safe to release him back to the community? Is that your theory? The theory is they're not precluded from diagnosing or treating him. But as far as prospects for improvement and release, they have to be tied to what is in his commitment order, to what the state actually proved to be on a reasonable doubt. So in your view, what needed to be done or may need in the future to be done is, if they're going to condition his release upon successful treatment of the paraphilia, they've got to go back and have a sort of miniature or supplemental commitment proceeding under which paraphilia is diagnosed? Correct. Under the statute, they'd have to prove it in court beyond a reasonable doubt. Does he have a right under the statute to petition for a review? Yes, I believe so. Has he done that? I believe so. And what was the outcome of that petition? Actually, part of it is in our Rule 28 jail letter, which we submitted last week. There were state court proceedings on this paraphilia issue where Mr. McGarry tried to raise it and dispute the diagnosis where the defendants represented an oral argument that it's irrelevant because it's not related to his commitment order. So in our view, they're trying to have it both ways, and they're saying in this court it is part of his commitment and diagnosis, and in state court where he's trying to dispute the underlying diagnosis, they're saying, well, the state court can't hear that because it's not relevant to your commitment order. Got it. Well, we've taken you a little over your time. Let's hear from the state, and we'll give you a chance to respond. Appreciate that. Thank you, Your Honor. May it please the Court, my name is Donna Hamilton. I'm an assistant attorney general, and I represent the defendants, and in this case those defendants are Dr. Sealing and Dr. Goligly, as the other defendants were dismissed below, and the appellants are not challenging those dismissals. I'm going to go right to the questions that you've been asking. You clearly know the record, and I won't waste your time with that. I'm not so sure that I do, so please educate me. Well, let me start with the non-issue of motions for appointment of counsel. Mr. Capello seems to argue that the denial of motions for counsel was an abuse of discretion, and he relies on a number of issues that specifically relate to his bedroom assignment on Alder West, and he claims he was placed there for retaliation, punishment, et cetera, and that these are issues that warranted appointment of counsel. The problem with that is that Mr. Capello was not moved to Alder West until six months after the court denied counsel. The facts underlying that claim didn't exist. Now, certainly the court, when it heard or reviewed Mr. Capello's response to summary judgment, could sui sponte have appointed counsel, but it certainly doesn't abuse its discretion by not doing that. Now, could you get to the merits? First off, I'm interested in the retaliation claim that Mr. Capello is making. Right. There is some evidence, or at least as I've heard it and as I've read here, there may be some evidence from which we could infer at least the possibility that he has been placed in Alder West, which is less advantageous than the other placements within the facility, because he's a litigator. Could you respond and say why there is insufficient evidence to survive a summary judgment motion, both as to whether the conditions are worse and therefore would be sufficiently adverse to be retaliatory. Certainly. And second, as to whether or not he was placed there because of his litigating behavior. Okay. I can definitely address that. First of all, as you noted earlier, the professional judgment that was exercised in separating out residents more than had been possible at the previous facility. This is a brand new construction facility that at the time that they took occupancy in the spring of 2004, there were approximately eight or nine living units and ultimately they moved up to, I believe, 12 different living units. To allow them to, pursuant to the direction from Judge Dwyer on the terrain junction, to separate discrete populations based on a number of issues, a number of factors, including things such as whether or not someone participated in treatment, whether someone harassed persons who were in treatment, medical fragility, the vulnerability of particular residents, these sorts of things. But Judge Dwyer didn't, say, set up separate living space for people who are litigators, did he? He did not. And the record doesn't support the inference that that was the reason for Mr. Capello's assignment initially to Alder West, which the record reflects he spent 11 months in Alder West and then moved to the Elm living unit, which is a medium-maintenance living unit. In responding to Judge Fletcher's question, why don't you focus for a moment on that issue of whether there's an issue of fact as to his being a causation issue, I guess, as to whether he's placed there because he's a litigator. Right. Mr. Capello points to three specific things in asserting that there was retaliation. First, he states, I deposed a number of staff in this litigation. Essentially, I litigate, therefore, it has to have been retaliation. But as you pointed out, Judge Fletcher, there's no causation connection. And that is the standard that we're looking at. I didn't say that. It hasn't demonstrated. I said it's not necessarily so. We're not going to say after the fact, therefore, because of the fact. That's not necessarily true. But we really want to know what is the evidence about why he was there. Second, he says, he points to a job readiness assessment that was prepared by a non-party that simply states the fact that Mr. Capello admits he spends his time litigating. There's no opinion attached to that factual statement. That's an ER-366. He claims that that contains a statement that denigrates him, and it simply does not by the face of it. Then he also asserts that there was another document that it was a treatment assessment, spelling out the facts of his condition at the SEC written by treatment providers, non-defendants, that was prepared in March of 2004, spelling out the barriers to treatment for Mr. Capello. And one of the items listed as a barrier to treatment was the fact that he has very plainly stated he will never participate in treatment, and it's his intent to litigate his way out of the program. Now, the reason that there is no causal connection between these three isolated statements... What about the statement that he says, somebody says, I forget now who it is, that's where we put the litigators? He's pointing to a declaration from a non-party reporting a hearsay statement of a non-party. He did not depose this person. There's no other evidence that the statement was even made or that the defendants in this case were aware that that was that person's opinion, even if it was. Because here we're looking at did Dr. Sealing and Dr. Goligly personally participate in making a decision to retaliate against Mr. Capello? That's the question. And I would point out that, first of all, Mr. Capello wasn't moved to Alder West until June of 2004. Dr. Sealing left his appointment at the Special Commitment Center in April of 2004. He cannot show that anything that Dr. Sealing, even if he was aware of Mr. Capello's bedroom assignment and there's no evidence that he was involved in any way, he was not on the resident placement committee making the decision. He wasn't even employed at the Special Commitment Center when Mr. Capello was placed on Alder West. Secondly, as to Dr. Goligly, Dr. Goligly was a clinical director at the time. And he, according to the resident placement committee notations, the ER is escaping me at the moment, it indicates who participated on the committee. And it was a group of clinicians that indicated that the clinical director, that would be Dr. Goligly, occasionally participated on an as-needed basis and the committee was making 200 bedroom assignment decisions at one time based on brand new opportunities to separate out resident groups. And the criteria for Alder West is a number of things, including a person who does not participate in treatment, and Dr. Goligly, Mr. Capello falls within that. And the fact that 11 months later he was moved to a different living unit also cuts against the very thin evidence, if anything, that the decision to place him on Alder West had anything whatsoever to do with litigiousness. So Ms. Hamilton, is your position that this declaration of Jeffrey Robinson attributing the statement to Kathy Harris, is not admissible evidence and therefore could not be considered? That is my position. It is hearsay and there was no evidence that Kathy Harris, an assistant clinical director, was a speaking agent on behalf of the special commitment center. And there's no evidence that even if she made the statement, that Dr. Goligly was even aware that that might have been her opinion. Was there an objection or a motion to strike from the state regarding the hearsay statement? Yes, we did indicate in our reply brief that that particular statement was hearsay and should not be considered. That's a different question. Did you make that objection in the district court? Yes, that's what I, in our reply to the summary judgment brief before the district court. Correct, correct. Okay. Moving on to the motion for counsel issue. As this court knows, appointment of counsel in a civil rights lawsuit. I'm less interested in the appointment of counsel issue and my colleagues can speak for themselves. You don't need to argue that one. Then I am with the merits issues that we've got going on here. One of the points that Mr. McGarry raised had to do with whether the district court erred in dismissing some of his claims based on Heck v. Humphrey and last week provided some... I have to say the one claim I mentioned it in for Mr. McGarry is the claim that he says, listen, my civil commitment order has schizophrenia and antisocial disorder. Later on, the paraphilia is added and they are keeping me in because I have not made what they view as satisfactory progress for paraphilia, but because that was not in my initial commitment order, they can't make that as a condition for release. What's your response? My response to that is, number one, there's no evidence in the record that Mr. McGarry's treatment was based on paraphilia after he was committed in February of 2004. His argument is that SCC was conditioning his treatment and opportunity for release on a diagnosis of paraphilia. The record simply does not support that. The 2002 assessment that was done where one of the diagnoses he carried at the time before his commitment indicated that the professional believed that one of his conditions was paraphilia. Who did that assessment? There was an assessment with the Department of Corrections with a doctor whose name escapes me. Then Dr. Goligly, before he was employed at the Special Commitment Center, did an independent assessment. He reviewed the DOC doctor's materials, did his own assessment, interviewed Mr. McGarry, and he reached the same conclusion as the DOC evaluator. Then, in the context of this case, in September of 2003, we had outside evaluators looking at the DOC doctor's case and looking at the DOC evaluator's case. They looked at the treatment that was being provided to every individual plaintiff in the case and expressed that expert opinion as to whether the treatment being provided, based on the information that existed at that time, and in this case, September of 2003 for Mr. McGarry, whether the treatment provided him with an opportunity to improve the condition for which he was confined, which is an inability to control his sexually violent behavior. Dr. DeMarco did that evaluation and concluded that, yes, based on the information that existed at that time, Mr. McGarry was receiving treatment that would assist him. Now, granted, at this point, he's also a pretrial committee. You can help me, actually, a little bit. What was his sexually violent behavior for which he was committed? Schizophrenia and antisocial behavior don't tell me much. He was committed of a number of very violent rapes. That doesn't sound like paraphilia at all. It sounds like sexually deviant behavior, but like Judge Gould, I've never seen the word before. There are lots of bad things that you can say about rape and deviance and so on, but it doesn't fit within the definition of paraphilia that I discovered. The fact of the matter is that when Mr. McGarry was committed, he stipulated to two conditions. He stipulated to schizophrenia, paranoid type, and he stipulated to antisocial personality disorder, and he stipulated that his antisocial personality disorder caused him to be unable to control his sexually violent behavior. So he stipulated to that. At that point, paraphilia is gone. It has nothing to do with anything. You can correct me, but my understanding of the definition of paraphilia is, as your opposing counsel said, it's a catch-all category, but it's a catch-all category that catches, according to the definition that I read, sexual interest that is divorced from copulative behavior or pre-copulative behavior. It's things like voyeurism and exhibitionism, all kinds of things that are not directly involved with copulation, and of course, violent rape does not fit within the definition of paraphilia. And he wasn't committed on that basis, so the definition of paraphilia is a complete red herring. It has nothing to do with the stipulation that he entered into and his actual commitment. Then he argues, based on information that existed before he stipulated that his treatment was being conditioned on that diagnosis, there is zero evidence in the record that his treatment from the date he was committed forward was in any way affected by a paraphilia diagnosis. And in fact, six months after he was committed, Mr. McGarry was approved to move into a less restrictive alternative housing, a less restrictive environment than the total confinement facility at the Special Commitment Center. So to assert that a diagnosis of paraphilia had anything to do with slowing him down, the record itself simply refutes that. And was that when he was released to the Pierce County facility, sort of a halfway housing? Right, and it's called a Security Community Transition Facility, and he was released to the SCTF in the fall of 2004. And then six months later, I don't believe this is in the record. I think it is. He was returned because he didn't do well. He was returned because he asked to be returned. He said, I do not wish to continue to participate in sex offender treatment, and I don't think I'm really a sexually violent predator. So he asked the committing court, either release me completely or send me back to the total confinement facility because I don't want to participate in treatment. And actually that stipulation is in the McGarry v. Richards, the case you just heard. It's in that, in the record in that case. So it's simply the record doesn't support an assertion that his treatment in any way was, or his release was in any way slowed down because of this diagnosis that didn't. Because of the paraphilia diagnosis. Because of the paraphilia diagnosis, which again is not the diagnosis for which he was committed. Do you have any other specific questions? No? I'm finished. Thank you for your time. Thank you very much. Response? Thank you, Your Honors. I'll be brief. First I'll respond to the arguments regarding Mr. Capello's claims. First, as we stated in our reply brief for Mr. Capello, the appellees did not object on the court below to the declaration of Mr. Jeffrey Robinson. Did they include it in, did you dispute that if I look in their reply brief on the summary judgment motion, the district court, I'm not going to find it there? I don't believe so, Your Honor. As we represented in our reply brief, they did not object. Well, we can resolve that one. But it's our position they did not object to, and therefore the objection is waived. In any event, we also argued in our reply brief that it is... Before you run out of time, would you turn to the revelation from your opponent's argument as to Mr. McGarry on this paraphilia diagnosis? What's your response to the factual chronology? Well, the response is this, Your Honor. Their motion for summary judgment was submitted in July 2004, several months after his commitment order was stipulated to and entered. At that time, they represented the district court using the declaration of Ms. DeMarco that here are the conditions underlying Mr. McGarry's commitment. Here is the summary of the treatment protocol and indicated treatment for paraphilia. So it is our position, and then subsequently in their opening brief in 2006, again they stated one of the conditions underlying his diagnosis, one of them is paraphilia. They stated it again in response to our Rule 28J letter. So to say that there's no record evidence that paraphilia is harming him now we think is not accurate. As compared to the admissions from the defendants, both in the court below and on this appeal. Again, we would reiterate that summary judgment was not appropriate on the paraphilia claim in the court below. That there's at least an issue of fact as to whether Mr. McGarry is... I'm sorry, I'm not sure I'm getting this right. I'm just trying to get a sense of the response to the argument that we've got two defendants here, one of whom was gone when the decision was made to commit him to Alder West. And the other with respect to whom he was intermittently in these meetings, they signed lots and lots of people, and you've got insufficient evidence to show that he himself personally participated in any decision to put him into Alder West. Well, as the record reflects, the Resident Placement Committee made the decisions as to housing arrangements, including the Alder West, including those confined to Alder West. We also submitted in the record meeting minutes from the subcommittee for the Resident Placement Committee. And there in attendance can clearly be seen a defendant sealing, defendant golligly. And attendance can be seen at the time the decision was made to put Mr. McGarry. Preceding May 2004, when he was actually sent to Alder West, there's a meeting minute from December 2003 where a defendant sealing is in attendance. But was he in attendance at a meeting at which it was decided to put Mr. Capello into Alder West? I think they were generally discussing housing assignments. No, but I'm asking you a different question. Do you have direct evidence that either of the defendants participated in the actual decision with respect to Mr. Capello? Not direct evidence, no, Your Honor. There is a letter in the record from Kathy Harris, Assistant Clinical Director, notifying Mr. Capello that the Resident Placement Committee had decided to place him in Alder West. But you don't have evidence as to who sat on that committee at the time that decision was made? As to who actually physically discussed it? No, it's not in the record. And do we have evidence as to when the decision was made as to Mr. Capello? That is to say, that's going to be particularly interesting with respect to Dr. Sellinger, of course, because at some point prior to the actual transfer. I would refer to the letter from Kathy Harris notifying Mr. Capello of his assignment to Alder West. I believe the date precedes May 2004, but it was after the meeting minute in December 2003. The ER site escapes me at this point. I'm looking at ER 339 and 340, which is headed Resident Placement Committee, and that looks to me to be meeting notes. Is that the document you were referring to earlier? I believe so. And that one doesn't indicate who was in attendance, other than I guess it does, it says who comprised the subcommittee, but it doesn't even say when the meeting occurred. It's sort of a summary. I would direct the court to ER 334. We'll take a look at it. Thank you.
judges: Fletcher, Gould, Tallman